**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| vs. | ) | 2:25-cr-220 |
| | ) | |
| DEWAYNE ROSSER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM ORDER**

Allegheny County Police Department Detectives were patrolling the McKees Rocks area of Pittsburgh in April 2021, when they noticed Defendant Dewayne Rosser's Cadillac Escalade.  Officers ran the license plate and found that the Escalade wasn't registered in Pennsylvania—the plate number matched a different make and model.  Officers thought the vehicle might be stolen so they turned on their lights and siren to pull over the Escalade.

After driving for a while, Mr. Rosser eventually pulled over into a 7-Eleven parking lot.  During the traffic stop, Mr. Rosser told the Detectives that he had a felony conviction and was not allowed to have a gun.  One officer saw a pistol holster in plain view in the car, and another saw a gun in plain view through the trunk window.  The officers learned that Mr. Rosser had a suspended license, so they cuffed him, took his phone, and transported him to the police station, where he was charged and released.  The officers eventually executed two search warrants on the vehicle and found drugs, a gun, and magazines.  Based on this, the government charged Mr. Rosser with being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g).

Mr. Rosser now moves to suppress all the evidence seized from the search and statements he made to officers during the traffic stop.  ECFs 46, 62, 71, & 85.  Based on the evidence adduced at the suppression hearing and relevant record, the Court grants in part and denies in part the motion.  The Court suppresses the statements Mr. Rosser

- 1 -

made to police due to a *Miranda* violation, but otherwise denies the motion in all other respects.

## BACKGROUND

At around 9:00 p.m. on April 7, 2021, Allegheny County Police Department Detectives Steven Sywyj and Judson Ekis were on patrol in an unmarked police car in the McKees Rocks area of Pittsburgh. ECF 83 at 84:9. In 2021, the police department had increased its patrolling presence in McKees Rocks because of an increase in violence there. *Id.* at 18:7–12. The Detectives noticed Mr. Rosser's Escalade, ran the license plate, and discovered that the plate wasn't registered. *Id.* at 18:15–24. The plate number returned a match for a different make and model of car.[1] Gov't Exhibit 8. This made them think that Mr. Rosser was driving a stolen car, so Detective Sywyj turned on his lights and siren to pull him over. ECF 83 at 19:17–22. Detective Sywjy testified at the suppression hearing that Mr. Rosser did not pull over right away, even though he passed several places to stop. *Id.* at 22:14–17. Mr. Rosser eventually pulled over in a 7-Eleven parking lot. *Id.* at 48:17–22.

Once Mr. Rosser was in the parking lot, the Detectives approached Mr. Rosser's vehicle with their guns drawn and ordered him to get out of the vehicle and placed him in handcuffs. *Id.* at 49:5–14. Detective Sywyj testified that he ordered Mr. Rosser out of the car and handcuffed him because he believed the Escalade was stolen, and because Mr. Rosser did not pull over immediately despite passing places to stop, and the heavy tinted windows meant the Detectives couldn't see inside the car. *Id.* at 22:11–18.

Detective Sywyj asked Mr. Rosser if he had a license. *Id.* at 24:4–6. Mr. Rosser told the Detectives that his license was suspended, which was confirmed once the Detectives searched his name and ID in the Pennsylvania license database. *Id.* at 24:1–21, Gov't

---

[1] Once the stop was effectuated, Detective Sywyj found that the car was registered in Ohio, but he credibly testified that he could not fully view the license plate until he pulled over Mr. Rosser due to the plate being somewhat obstructed. ECF 83 at 21:6–20.

- 2 -

Exhibit 7. Mr. Rosser also told Detectives that his ID card was in a wallet attached to his key, which, at that point, was still in the ignition. *Id.* Detective Sywyj testified that he believed that Mr. Rosser consented to retrieval of the ID card, so Detective Sywyj retrieved the ID card from the ignition. *Id.* at 27:12–16. While he retrieved the key, he saw a black nylon pistol holster protruding from under the driver's seat. *Id.* at 28:16–24.

Detective Sywyj credibly testified that this observation raised concerns. *Id.* at 29:13–18. He asked Mr. Rosser if he had a gun in the vehicle. *Id.* at 29:19–24. Mr. Rosser said he didn't know, but that his wife had a gun. *Id.* at 29:25, 30:1. Detective Sywyj then testified that he asked Mr. Rosser if Mr. Rosser could have a gun; Mr. Rosser said no, because was a felon. *Id.* at 30:1–5.

Detective Sywyj testified that up until this point, no law enforcement officer had provided Mr. Rosser with a *Miranda* warning. *Id.* at 30:6–8. He testified that he believed Mr. Rosser's statements were voluntary because officers did not threaten or use any harsh language while questioning him. *Id.* at 31.

Sometime during the stop, Allegheny County Police Department Officer Justin Kluchurosky arrived at the scene. *Id.* at 6:23–25. When he got there, he walked around the Escalade and looked inside the windows. *Id.* at 7:6. Officer Kluchurosky testified that he used a flashlight to look inside Mr. Rosser's vehicle and observed a gun among several tools and a bucket. *Id.* at 9:15–16.

Detective Sywyj testified that he also seized Mr. Rosser's cell phone during the stop. *Id.* at 34:22–25, 35:1–3. Detective Sywyj eventually obtained a search warrant for the cell phone. *Id.* at 35:4–6. He did not search the cell phone prior to obtaining the search warrant. *Id.* at 35:7–9.

Mr. Rosser's vehicle was ultimately towed to the Allegheny County Police Department impound lot and Mr. Rosser was transported to the Allegheny County Police Department. Detective Sywyj testified that shift supervisor, Sergeant Binder, determined and authorized that Mr. Rosser's vehicle should be towed as part of the

Allegheny County Police Department's standard procedures for towing vehicles driven by individuals with suspended licenses.  *Id.* at 25–26, Gov't Exhibit 15.

A state search warrant was issued for the car, based on a probable-cause affidavit from Detective Sywyj stating that Mr. Rosser is a person not to possess firearms.  Gov't Exhibit 8.  When officers executed the search warrant, they recovered a firearm from the trunk and magazines from the glove box, which form the basis of the indictment.  A second federal search warrant was later obtained to search the contents of Mr. Rosser's cell phone.  Gov't Exhibits 10 & 11.

## DISCUSSION & ANALYSIS

Mr. Rosser offers the following grounds for suppression: (1) the officers did not have reasonable suspicion to initiate a traffic stop of Mr. Rosser's car; (2) the officers did not have a basis to detain and handcuff Mr. Rosser outside of his vehicle; (3) the officers violated Mr. Rosser's *Miranda* rights;  (4) Mr. Rosser's car was illegally searched when Detective Sywjy retrieved Mr. Rosser's ID from the keychain on the ignition, Officer Kluchurosky touched his flashlight to the window of Mr. Rosser's trunk shield, and Detective Sywyj later retrieved magazines from the glove box; (5) Mr. Rosser's car was illegally towed; (6) the two warrant applications lacked probable cause, particularly the federal search warrant, which insufficiently described the connection between the phone and the crime under investigation; and (7) Mr. Rosser's cell phone was improperly seized for several weeks before the warrant was obtained.  ECFs 46, 62, 71, & 85.

## I.    The officers had reasonable suspicion to effectuate the traffic stop.

Mr. Rosser challenges the reasonable suspicion for the traffic stop, but the Court concludes that the officers had ample suspicion to stop him.

Reasonable suspicion is a less demanding standard than probable cause.  It requires "more than a mere hunch" and "only a particularized and objective basis for suspecting criminal activity."  *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (cleaned up).  "In assessing reasonable suspicion, three themes must remain front and

center: (1) reasonable suspicion must always be evaluated under the totality of the circumstances; (2) when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person; and (3) reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *United States v. Romero*, 559 F. Supp. 3d 437, 447 (W.D. Pa. 2021) (Ranjan, J.) (cleaned up).

Applying these principles, Detective Sywyj had reasonable suspicion to pull over Mr. Rosser. First, Detective Sywyj had reasonable suspicion to initiate the stop when he ran Mr. Rosser's license plate in the system and the plate returned a match for a car with a different make and model. A reasonable officer could think that this meant the car was stolen.[2] Second, Detective Sywyj credibly testified that the McKees Rocks area where officers observed Mr. Rosser driving had seen an increase in violence (*i.e.*, a high crime area). *See United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) ("the fact that the stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis.") (cleaned up). And third, Mr. Rosser did not pull over for some time, despite passing several places to stop.[3] Taken together, all this was reasonable suspicion for the initial stop. *See United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("[F]light upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion.").

## II. The officers had reasonable suspicion to detain Mr. Rosser outside of his car.

---

[2] Mr. Rosser offered evidence of what an Ohio plate and what a Pennsylvania plate look like, and argued that there is no way that officers could have mistaken those plates. The Court, however, finds the officers' testimony credible. It was dark outside, and the plate was partially obstructed. Moreover, based on the Court's view of the entire stop here, the officers' actions were a bit sloppy at times; so it is plausible that they were not entirely focused on the state of the license plate when they ran it.

Mr. Rosser next challenges the officers' decision to have him exit the vehicle and handcuff him outside the vehicle.  Mr. Rosser doesn't contest that the officers could have done this had they thought Mr. Rosser was fleeing in a stolen car.  *See, e.g., United States v. McMillan*, 227 F. Supp. 3d 432, 437 (W.D. Pa. 2017) (Hornak, J.) ("The officer's instruction to Defendant to leave the car was lawful, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), as was the officer's decision to restrain Defendant in handcuffs.")  Instead, Mr. Rosser argues, as a factual matter, that he wasn't fleeing from police.

Based on the testimony at the suppression hearing, the Court finds the officers' testimony credible that they thought Mr. Rosser was refusing to stop, despite an opportunity to do so.  Mr. Rosser offered as evidence a video reenactment of an investigator driving the same route that night.  Defense Exhibit H; *see also* ECF 83 at 83.  Based on this, he argued that there wasn't really a good place to pull over.  On review of the video, the Court simply disagrees.  There were several places to pull over, and this supports the officers' beliefs that Mr. Rosser was refusing to do so.

### III.    Mr. Rosser was in custody for purposes of *Miranda*, but his statement admitting to be a felon could still be used in formulating probable cause as part of the state-court warrant application.

Mr. Rosser argues that his statements must be suppressed in violation of the Fifth Amendment because he was in "custody" when he made the statement about being a felon, but was never *Mirandized*.  ECF 46 at 9–10.  The Court agrees that Mr. Rosser was in custody for Fifth Amendment purposes because he was not free to leave and there was a restraint on his movement "of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

"Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether

the suspect voluntarily submitted to questioning"). *United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006).

Weighing these factors here, and while perhaps a close call, the Court finds that they tip towards "custody." On one side of the scale: the length of the interrogation was short (only a few minutes), the tone of the conversation was casual, and Mr. Rosser voluntarily submitted to questioning—all suggesting no custody. However, on the other side of the scale is that Mr. Rosser was *not* told he could leave or that he was *not* under arrest, the interaction occurred at night outside the vehicle, Mr. Rosser was handcuffed, there were two officers, and the officers had their guns drawn. These latter factors ultimately tip the scale, and the Court finds that Mr. Rosser objectively was restrained and so was in custody for purposes of *Miranda*. *See, e.g.*, *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) ("the objective test is whether the government has in some meaningful way imposed restraint on a person's freedom of action") (cleaned up); *New York v. Quarles*, 467 U.S. 649 (1984) (finding that suspect who was surrounded by at least four police officers and handcuffed when questioned was in police custody at time of questioning for purpose of determining whether case came within ambit of *Miranda*, even though he was not yet formally arrested).

So Mr. Rosser's statements to police, including that he was a felon or couldn't possess a gun, is inadmissible at trial as direct evidence as a violation of *Miranda*. The Court will suppress direct evidence of those statements.

That said, the Court, based on the suppression-hearing record, doesn't find that the questioning here was unduly coercive such that it amounted to a due-process violation or involuntary statement. ECF 83 at 30 (credibly describing the discussion as casual and voluntary and Mr. Rosser as cooperative). This is significant because it means that there is no fruit of a poisonous tree that infected the later state-court warrant application. In other words, the officers were free to rely on Mr. Rosser's statements in their assessment of probable cause to obtain the later state-court warrant and seize the gun. *United States*

*v. DeSumma*, 272 F.3d 176, 180–81 (3d Cir. 2001) ("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued.  Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted.").

### IV.    Mr. Rosser's car was legally searched before it was towed.

Mr. Rosser argues that his car was illegally searched before it was towed and a search warrant was executed.  For the reasons below, the Court finds that his car was not illegally searched.

### a. Mr. Rosser consented to Detective Sywyj retrieving his identification card.

Based on Detective Sywyj and Mr. Rosser's conversation about Mr. Rosser's ID card, the Court finds that Mr. Rosser gave consent to the officer to reach into the car to obtain the ID card.  ECF 83 at 27–28.

"In determining the scope of consent, courts look beyond the language of the consent itself, to the overall context.  If when giving consent to search, the party limits the scope of the consent, courts narrowly construe the limitation to determine whether the officers' conduct was objectively reasonable."  *United States v. Coates*, 685 F. Supp. 2d 551, 555–56 (M.D. Pa. 2010), aff'd, 462 F. App'x 199 (3d Cir. 2012) (cleaned up) (citing *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002) (upholding consent search where homeowner instructed police not to "tear up" premises, where police dismantled but did not damage stereo speaker in which evidence was found).

Here, Detective Sywjy retrieved what Mr. Rosser pointed him to.  Based on how this conversation was depicted to the Court, the Court finds that Mr. Rosser authorized the officer to retrieve the ID.  ECF 83 at 27:9–25, 28:1–4.  Additionally, there isn't evidence that Detective Sywjy exceeded the scope of Mr. Rosser's consent to retrieve the ID; he simply reached into the open car door and took the ID from the wallet on the

ignition. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?") (cleaned up).  Based on the context of the interaction here, the reasonable conclusion of Mr. Rosser telling officers that his ID in his wallet attached to the key in the ignition is that Mr. Rosser consented to Officer Sywyj retrieving the ID.

### b. Officer Kluchursky's use of a flashlight did not constitute an illegal search.

Mr. Rosser next challenges Officer Kluchursky's use of a flashlight to look into the vehicle and spot the gun in plain view.  The Court finds that this is proper.

The use of the flashlight to peer through a car window is permissible. *See Texas v. Brown*, 460 U.S. 730, 740 (1983) ("The use of a searchlight is comparable to the use of a marine glass or a field glass.  It is not prohibited by the Constitution.  Numerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.") (cleaned up).

Mr. Rosser argues that the flashlight touched the glass of the window, which made it improper.  As a legal matter, the Court doesn't find the touching of the flashlight to the exterior glass of the trunk for a brief moment to be a Fourth Amendment search. *United States v. Martin*, 618 F. Supp. 3d 205, 215 (W.D. Pa. 2022) (Hardy, J.) ("Defendant was not seized when Detective McGee approached his vehicle and shined a flashlight in the passenger window *or tapped on it*, which caused Defendant to lower the window.") (emphasis added).  As a factual matter, the Court doesn't find that this is what happened.

Officer Kluchursky didn't say he touched the glass; he testified that he either placed his flashlight "up against" the glass "or right up to it." ECF 83 at 15:24–25, 16:1–7. The Court does not interpret this testimony as meaning he physically touched the glass, particularly given the context of Officer Kluchursky's earlier testimony during the hearing.

The use of a flashlight here was proper and cannot be considered to be a separate search under the Fourth Amendment.

### c. Detective Sywyj's retrieving magazines from the glove box was under the search warrant and therefore legal.

Detective Sywyj credibly testified that the pictures of the magazines, holster, and gun were taken during the execution of the search warrant. ECF 83 at 29, 33. Thus, officers opening the glove box did not exceed the scope of the search warrant.[4]

## V. Officers did not illegally tow Mr. Rosser's vehicle.

Mr. Rosser argues that officers illegally seized his car by towing it. ECF 46 at 8. Mr. Rosser contends that the community-caretaking exception, which allows for warrantless tows absent probable cause, does not apply because a family member could have picked up the car. *Id.* at 9. The Court disagrees.

Officers may lawfully tow a vehicle (1) pursuant to reasonable police policies and procedures; or (2) under the community-caretaking exception. *United States v. Smith*, 522 F.3d 305, 315 (3d Cir. 2008). As to the first, the Allegheny County towing policies and procedures are unclear. The policy itself doesn't provide grounds for officers to have towed the vehicle here, and Detective Sywyj's testimony was not clear enough as to the

---

[4] Mr. Rosser submitted Defense Exhibit K, a police report authored by Officer David Gasparovich, which states: "Upon arrival County Police had the driver, Dwayne Rosser, in custody. Per County Police, there was a holster and pistol magazines in plain view in the front seat area." But the Court gives this little weight because the report essentially reports things second hand. Detective Sywyj testified that the pistol holster was in plain view but not the magazines, and the Court found his testimony to be credible and he was the most directly knowledgeable.

towing policies and procedures at the time of the tow.  Gov't Exhibit 15, ECF 83 at 25–26.

But as to the community-caretaking exception, there is sufficient evidence that towing was reasonable.  Before the car was towed, officers had seen a pistol holster in the car, Mr. Rosser told the officers he was felon, and Mr. Rosser told the officers that his license was suspended, which officers confirmed when they ran his license in the PennDot system.  *Id.* at 24, Gov't Exhibit 7.  Leaving the car unattended in the 7-Eleven parking lot, with a gun in the car, would not have been safe.  The towing was therefore reasonable and legal.  *See United States v. Smith*, 522 F.3d at 315 (holding that towing under the community-caretaking exception must be reasonable in the circumstances).

## VI.    The search warrants are supported by probable cause.

Mr. Rosser challenges various aspects of the facts that went into the two search-warrant applications.  ECFs 46 & 62.  The Court finds that those facts are accurate, and their totality establish probable cause for both warrants.

*First*, the officers' observations about seeing the gun and holster were credible. Mr. Rosser challenges the statements in the state search-warrant application that Detective Sywyj saw a holster in the front driver's seat and Officer Kluchurosky saw a gun in the trunk.  ECF 83 at 12, 28–29.  The Court finds that these statements were supported.  Detective Sywyj credibly testified that he saw a "black nylon holster" "protruding from under the driver's seat."  *Id.* at 28:23–24.  He believed that the holster was for a pistol.  *Id.* at 51:13.  Officer Kluchursky credibly testified that he saw a gun in plain view in Mr. Rosser's trunk.  *Id.* at 8:10–14.  He testified that the gun was underneath a bucket and amongst tools, wrenches, and paper towels.  *Id.* 7:13–16, 8:4–6. He also testified that he used a flashlight to see inside the car because the car had tinted windows.  *Id.* at 7:9, 12:12–18. The photos submitted into evidence corroborate all of this testimony.  Gov't Exhibits 3, 4, 5, 6, 7.

**Second**, the statement in the state-court warrant affidavit that Mr. Rosser admitted that he was a felon and could not possess a firearm is supported. As previously noted, while such a statement might be inadmissible as direct evidence at trial due to a *Miranda* violation, the statement can be used for probable-cause purposes.

**Third**, with respect to the federal search warrant application specifically, there were sufficient facts to support searching the cell phone.

Detective Swyjy had already executed the state search warrant when he applied for the federal search warrant for the cell phone and so had found the gun, 242 grams of marijuana, and seven individually packaged bags of crack cocaine. Gov't Exhibit 11. This evidence was included in the federal search warrant. Based on that evidence, the search warrant indicates that Mr. Rosser may have violated 21 U.S.C. §§ 841, 846, and 18 U.S.C. §§ 922, 924—crimes related to drug trafficking and illegal possession of a firearm. Gov't Exhibit 10. The federal search warrant also includes a paragraph noting that based on Detective Swyjy's training and experience, he is "aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones." *Id.*

In total, the affidavit states that Mr. Rosser had a gun, distribution-type packets of drugs, and a phone all on him or in his vehicle, he was arrested for eluding police, and that the Detective's training and experience were suggestive that the cell phone probably was used for drug-trafficking activities. This is all sufficient evidence to establish probable cause. *See United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (finding that direct evidence linking a place to be searched with a crime is not required for the issuance of a search warrant and stating that "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime.") (cleaned up).

Mr. Rosser cites a recent and thoughtful opinion from Judge Weilheimer of the Eastern District to argue otherwise. There, the court found a warrant for a phone—resting largely on the "training and experience" paragraph plus drugs—lacking in probable cause. *United States v. LaCosta-Franco*, ___ F. Supp. 3d ___, 2026 WL 906682 (E.D. Pa. Apr. 2, 2026) (holding that, on issue of first impression, defendant's possession of cell phones, along with general description of cellphone use and capabilities, was not sufficient to create nexus between charged narcotics crimes and cell phones, and therefore search warrant was not supported by probable cause).

This case does not control here. As the court there was careful to acknowledge, the assessment of these cases is very fact-specific. *Id.* at *7. Even if this Court were to accept that court's assessment generally of how the close the nexus must be between a phone and the drug activity at issue, the Court finds that this case presents a number of additional facts supportive of probable cause: *e.g.*, arrest for eluding police, and the gun. In fact, as it pertains to the gun, the Detective specifically stated in the affidavit: "In my experience, the phones of individuals who illegally possess firearms often contain evidence of unlawful firearm possession in the form of text messages, emails, and social media posts. It has also been my experience that such phones often contain information regarding how an unlawful possessor acquired his firearm." Gov't Exhibit 11. The magistrate judge here was free to rely on this allegation in the totality of her analysis.

In sum, the Court finds that both warrants were supported by sufficient probable cause. [5]

---

[5] Even if the warrants here might have been lacking, the good-faith exception applies. Based on the facts noted above in both warrant applications, a reasonable officer would not think that a search under these warrants was so facially deficient or so lacking in probable cause as to be unconstitutional. *See United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021) ("the good faith exception to the exclusionary rule, which prohibits suppression of evidence obtained in objectively reasonable reliance on a warrant later invalidated for lack of probable cause") (cleaned up).

**VII.   The government's 16-day seizure of Mr. Rosser's cell phone prior to applying for the federal search warrant was reasonable.**

Mr. Rosser also challenges the search and seizure of his cell phone, specifically the 16-day delay between officers seizing his phone incident to his arrest and applying for the federal search warrant. ECF 85 at 17. The Court finds that the seizure for 16 days wasn't unreasonable based on the circumstances here.

As an initial matter, the cell phone was seized incident to Mr. Rosser's initial detention and transport to the police station, so was lawful. *See Riley v. California*, 573 U.S. 373, 386, 388 (2014); *Maryland v. King*, 569 U.S. 435, 449 (2013). But Mr. Rosser was released at the station, and the police kept the phone for 16 days before applying for the warrant. The question is whether the 16-day delay was reasonable. The Court finds it was.

The constitutionality of extended seizures of personal effects pending law enforcement applying for turns on whether warrantless seizure is "reasonable" until a proper warrant could be obtained. *Illinois v. McArthur*, 531 U.S. 326, 337 (2001). In *McArthur*, the Supreme Court outlined four factors to determine reasonableness: whether (1) the police had probable cause to believe the property being seized contained evidence of a crime; (2) the police had "good reason to fear" evidence would be destroyed before a warrant could be obtained; (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) the time period of the seizure "was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 331–33. "To determine whether [a] seizure became unreasonable," courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (quoting *United States v. Place*, 462 U.S. 696 703 (1983)) (cleaned up).

- 14 -

Regarding the first factor, the police had probable cause with respect to the phone upon execution of the state search-warrant—this all happened on the day of the incident or shortly thereafter.

Regarding the second factor, that is neutral. On one hand, because officers had located the gun and drugs from the state search warrant and had their experience of Mr. Rosser refusing to stop, it would be reasonable to conclude that he might destroy incriminating evidence on his phone. On the other hand, Mr. Rosser didn't exhibit any specific behavior as to hiding the phone when it was seized.

Regarding the third factor, there were reasonable efforts by law enforcement to reconcile their law enforcement needs with the demands of Mr. Rosser's personal privacy. In the 16 days, Detective Swyjy applied for the state search warrant and executed it. This was one of his first federal warrants, and he testified that he went back and forth with the AUSA as to revisions. ECF 83 at 35. So there were some appropriate justifications for some of the delay. Moreover, there is no indication that Mr. Rosser asked for the phone back, which the Third Circuit and Supreme Court have found to be an important consideration as to the defendant's privacy interests. *See, e.g.*, *United States v. Johns*, 469 U.S. 478, 487 (1985) (defendants who "never sought return of the property" cannot argue that delay adversely affected Fourth Amendment rights); *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) ("[I]t is undisputed that Stabile did not ask for the return of his hard drives until February 15, 2008—eighteen months after the initial seizure of the hard drives.")

Regarding the fourth factor, while every case is different, 16 days is not so unduly long of a delay based on the facts here. *See United States v. Stabile*, 633 F.3d (holding that three-month delay in obtaining state search warrant and searching seized hard drives was reasonable).

Based on these factors, the Court finds the delay between the seizure of the phone and the subsequent warrant to be reasonable.

## CONCLUSION

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** Mr. Rosser's motion to suppress (ECF 46).  The statements Mr. Rosser made to law enforcement shall be suppressed as direct evidence.  Otherwise, the motion is denied.


DATE: June 30, 2026

BY THE COURT

/s/ J. Nicholas Ranjan
United States District Judge